IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|                                              |   |          |
|----------------------------------------------|---|----------|
| BASF AGRO B.V., ARNHEM (NL), WADENSWIL BRANCH, et al. )  |   |          |
|                                              ) |          |
| Plaintiffs,                                  ) |          |
|                                              ) |          |
| v.                                           ) | 1:10CV276 |
|                                              ) |          |
| MAKHTESHIM AGAN OF NORTH AMERICA, INC. (MANA), et al. ) |   |          |
|                                              ) |          |
| Defendants.                                  ) |          |

**MEMORANDUM OPINION AND ORDER**

OSTEEN, JR., District Judge

　　Presently before the court is Plaintiffs' Motion for a Preliminary Injunction (see Docs. 8, 73, 89). This court has considered the relevant pleadings, and a hearing on the motion was held on May 4-5, 2011. For the reasons that follow, this court will deny Plaintiffs' motion. Any findings or conclusions in this Memorandum Opinion are based upon the record as it relates to Plaintiffs' Motion for a Preliminary Injunction and are made for the limited purpose of deciding that motion. These findings and conclusions are made without prejudice to future presentations of evidence or arguments by the parties.

**I. BACKGROUND**

　　Plaintiffs BASF Agro B.V., Arnhem (NL), Wädenswil Branch ("BASF") and Bayer S.A.S. (collectively, "Plaintiffs") allege

1

that Defendants Makhteshim Agan of North America, Inc. and Control Solutions, Inc. (collectively, "Defendants") will infringe United States Patent Nos. 6,414,010 ("the '010 patent") and 6,835,743 ("the '743 patent"), in violation of 35 U.S.C. § 271.  Specifically, Plaintiffs assert that Defendants will infringe claims 1, 2, 6, 8, 9, 10, 18, 19, 21, and 23 of the '010 patent and claims 1, 2, 5, 6, 7, and 14 of the '743 patent. (Pls.' Mem. Law Supp. Renewed Mot. Prelim. Inj. (Doc. 93) at 11.)[1]

Inventor Yasuo Kimura ("Mr. Kimura") acquired the '010 patent in 2002 and the '743 patent in 2004.  Both patents are entitled "Pesticidal Pyrazoles and Derivatives," and both teach a method of using certain insecticidal compounds.[2]  Bayer S.A.S. is the assignee and owner of both the '010 patent and the '743 patent (collectively, "the Kimura patents"), and BASF is the exclusive licensee of the Kimura patents in the United States with respect to the insecticidal compound Fipronil.  (See Compl. (Doc. 1) ¶¶ 13, 15.)

---

[1] All citations in this Memorandum Opinion to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

[2] It is undisputed that the '743 patent is a divisional patent with the same priority date and specification as the '010 patent.  (See Markman Hr'g Tr. (Doc. 148) at 10-11.)

2

**II. LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy afforded prior to trial" that temporarily provides "the relief that can be granted permanently after trial." Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 345 (4th Cir. 2009), vacated on other grounds, 130 S. Ct. 2371 (2010) (mem.). To obtain a preliminary injunction, a plaintiff "must establish '[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" Id. at 346 (alterations in original) (quoting Winter v. NRDC, Inc., 129 S. Ct. 365, 374 (2008)). "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. NRDC, Inc., 129 S. Ct. 365, 375-76 (2008) (citation omitted).

**III. ANALYSIS**

As an initial matter, this court concludes that it has jurisdiction to decide Plaintiffs' Motion for a Preliminary Injunction at this time. It is undisputed that, as of the filing of the complaint in this case, Defendants had not yet engaged in activities that potentially infringe the Kimura patents. However, Plaintiffs assert, and this court agrees, that jurisdiction is proper because Defendants have "taken concrete

3

steps" and "made meaningful preparation . . . with intent to engage in potentially infringing activities" by, inter alia, obtaining Fipronil technical material and securing EPA approval of a master label[3] for a Fipronil-related product.  See Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc., 363 F.3d 1361, 1378 (Fed. Cir. 2004) (internal quotation marks omitted).

This court begins its substantive analysis by considering whether Plaintiffs have satisfied the first prong of the test for preliminary injunctions, that is, whether Plaintiffs have established that they are likely to succeed on the merits.  See Real Truth About Obama, Inc., 575 F.3d at 346.  In order to demonstrate a likelihood of success, Plaintiffs must show that, "in light of the presumptions and burdens that will inhere at trial on the merits," (1) they will likely prove that Defendants infringe the Kimura patents and (2) Plaintiffs' infringement claims will likely withstand Defendants' challenges to the validity and enforceability of the Kimura patents.  Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997) (citation omitted).  Plaintiffs need only show that they will likely prove that Defendants infringe "at least one valid and enforceable patent claim."  Abbott Labs. v. Andrx Pharm., Inc.,

---

[3] "The [master] label of a termiticide provides important use instructions that pest management professionals ('PMPs') must follow in order to comply with federal . . . regulations." (Potter Decl. (Doc. 95-4) ¶ 28.)

4

473 F.3d 1196, 1201 (Fed. Cir. 2007) (citation omitted).

Plaintiffs contend that the Exterior Perimeter/Localized Interior ("EP/LI") treatment instructions that are contained in the master label for Defendants' Taurus SC product induce infringement of the Kimura patents. (Pls.' Mem. Law Supp. Renewed Mot. Prelim. Inj. (Doc. 93) at 11 ("Defendants' Taurus label provides instructions for customers to apply the product using . . . the Exterior Perimeter/Localized Interior (EP/LI) treatment methods covered by the '010 and '743 patents . . . .").) Plaintiffs have produced declarations from expert witnesses whose stated opinions support this argument. (Potter Decl. (Doc. 95-4) ¶¶ 31, 65, 143; see Davis Decl. (Doc. 10-3) ¶ 31.) This court will therefore consider the scope of the Kimura patents in determining whether Plaintiffs are likely to succeed on the merits.

All parties acknowledge that construction of some of the Kimura patents' claim terms is case-dispositive. (See Joint Pre-Hr'g Statement (Doc. 133) at 2, 19-20.) Thus, this court's construction of disputed claim terms, and the resulting scope of the relevant patent claims, substantially affects this court's analysis of Plaintiffs' likelihood of success on the merits. After this court's consideration of the parties' arguments as to the Markman claim construction issues, particularly as to the disputed claim term "Process for the protection of a [future]

5

building against damage caused by insects,"[4] (Compl. Ex. B (Doc. 1-3) at 5, col. 5, ll. 51-52; id. at 6, col. 7, ll. 42-43; Compl. Ex. C (Doc. 1-4) at 5, col. 5, ll. 54-55),[5] this court concludes that Plaintiffs have failed to show that they will likely prove that the asserted claims of the Kimura patents cover the EP/LI treatment methods described in Defendants' Taurus SC master label. Thus, this court concludes that Plaintiffs have not established that they are likely to succeed on the merits.

Federal Circuit precedent requires that construction begin with the claim term itself and the ordinary meaning that would be

---

[4] Determining the scope of patent claims requires construction of the claims' terms, which is a matter of law for the court. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 391 (1996). "Process for the protection of a [future] building against damage caused by insects" is the disputed claim term that best illustrates the disclaimer issues in this case, which this court believes substantially limit the scope of the Kimura patents for purposes of deciding Plaintiffs' Motion for a Preliminary Injunction. This court will enter a final order construing all the disputed claim terms of the Kimura patents in the near future.

[5] Dependent claims 2, 6, 8, 9, 10, and 18 of the '010 patent incorporate by reference all the limitations of claim 1 of the '010 patent. See 35 U.S.C. § 112 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."). Dependent claims 21 and 23 of the '010 patent incorporate by reference all the limitations of claim 19 of the '010 patent. See id. Dependent claims 2, 5, 6, 7, and 14 of the '743 patent incorporate by reference all the limitations of claim 1 of the '743 patent. See id. Thus, this court's preliminary construction and findings as to the disclaimers relevant to this disputed claim term, which is contained in claims 1 and 19 of the '010 patent and claim 1 of the '743 patent, apply to all the asserted claims of the Kimura patents.

attributed to the words by a person skilled in the relevant art. <u>Tex. Digital Sys., Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1201-02 (Fed. Cir. 2002). Taken in isolation, "Process for the protection of a [future] building against damage caused by insects" is self-explanatory and appears to require no special construction: the Kimura patents claim a process for the protection of a building against damage caused by insects, and the patents go on to describe how to practice that process. Turning to the patents' specification, however, <u>see</u> <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), <u>aff'd</u>, 517 U.S. 370 (1996), this court finds a significant limitation of the claimed process, which is summarized in the following specification language: "Another object of the instant invention is to provide a termite treatment without barrier." (Compl. Ex. B (Doc. 1-3) at 3, col. 1, ll. 43-44.) This court finds the foregoing language to be an express, intrinsic disclaimer of subject matter, such that this claim term will not carry its ordinary meaning. <u>See</u> <u>CCS Fitness, Inc. v. Brunswick Corp.</u>, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002).

The specification contains some important guidance as to what Mr. Kimura meant when he disclaimed "barrier" treatments, stating: "Conventional termite control operators apply the chemical around or under the building or houses to form a barrier against termites invasion. However loopholes in the treatment

may cause failure of protection of the houses." (Compl. Ex. B (Doc. 1-3) at 3, col. 1, ll. 10-13.) Although this language is helpful, neither the claims nor the specification make fully clear what is meant by "without barrier," and this court therefore turns to the Kimura patents' prosecution history. See Markman, 52 F.3d at 980.

In a Patent and Trademark Office Action dated February 2, 2001, Mr. Kimura's patent application was rejected, in part because the examiner deemed the invention unpatentable over certain prior art. (Crystal Decl. Ex. 5 (Doc. 51-5) at 5.) Mr. Kimura responded on August 2, 2001, with an Amendment in which he sought to distinguish his invention from the prior art cited by the examiner. (Id. Ex. 6 (Doc. 51-6).) Mr. Kimura summarized his disagreement with the examiner as follows:

> Although some of the documents cited by the Examiner teach that the continuous barrier may be created by the application of the insecticide at discrete locations around the perimeter of the building, the insecticide is still applied in a manner so that a continuous barrier is created around the building to be protected. None of these documents teaches the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide.

(Id. at 15.)

Despite Mr. Kimura's argument, his application was again rejected in an Office Action dated September 20, 2001. (Crystal Decl. Ex. 7 (Doc. 51-7) at 3.) Mr. Kimura responded on January 22, 2002, with an Amendment After Final Rejection, (id. Ex. 8

8

(Doc. 51-8)), and on January 30, 2002, with a Supplemental Submission, the latter of which consisted of a Declaration by Dr. Joe Hope ("Dr. Hope"), who represented himself as "skilled in the art with respect to the control of termites in domestic buildings, specifically the control of subterranean termites," (id. Ex. 9 (Doc. 51-9) ¶ 5). Dr. Hope stated that the process claimed in Mr. Kimura's application "allows termites access to a structure that is being protected." (Id. ¶ 11.) He stated further "[t]hat the teaching of the common general knowledge and prior art as of [the priority date of Mr. Kimura's application] directs the skilled artisan to make a barrier treatment of chemical insecticide around a structure in order to ensure that the said chemical insecticide is unavoidable by termites (i.e., no untreated locations)." (Id. ¶ 12.)

In light of the foregoing, this court preliminarily finds that, in both the specification and during prosecution, Mr. Kimura disclaimed insecticide application methods that "ensure that the . . . chemical insecticide is unavoidable by termites." (Id.) What Mr. Kimura claimed as his own invention is an insecticide application method that "teaches the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide." (Crystal Decl. Ex. 6 (Doc. 51-6) at 15.)

While the prosecution history clarifies that Mr. Kimura disavowed insecticide application methods that aim to eliminate "loopholes," it is the patent specification that demonstrates the extent to which Mr. Kimura disclaimed such methods. As noted above, the specification states: "Conventional termite control operators apply the chemical around <u>or</u> under the building or houses to form a barrier against termites invasion. However loopholes in the treatment may cause failure of protection of the houses." (Compl. Ex. B (Doc. 1-3) at 3, col. 1, ll. 10-13 (emphasis added).) This language makes it clear that Mr. Kimura's understanding was that applying insecticide without loopholes either around <u>or</u> under a building would constitute a barrier treatment.[6] In other words, according to Mr. Kimura, applying insecticide without loopholes around a building, but not under the building, would constitute a barrier treatment. Likewise, according to Mr. Kimura, applying insecticide without loopholes under a building, but not around the building, would constitute a barrier treatment. Thus, when Mr. Kimura disclaimed

---

[6] There is no dispute that "around" and "under" refer to different treatment locations. (<u>See</u> <u>Markman</u> Hr'g Tr. (Doc. 148) at 48 ("[A]round means exterior. We agree with that. Under means interior, we agree with that.").) Thus, this court finds that "or" in the phrase "around or under" is used in its disjunctive sense, not its explanatory sense.
    Similarly, there is no dispute that, for purposes of construing the Kimura patents, "around," "exterior," and "outside" are all equivalent. Likewise, there is no dispute that "under," "interior," and "inside" are all equivalent. (<u>See</u> <u>id.</u>)

barrier treatments, (id. at 3, col. 1, ll. 43-44 ("Another object of the instant invention is to provide a termite treatment without barrier.")), he disclaimed applying insecticide without loopholes around a building, and applying insecticide without loopholes under a building, respectively.

The prosecution history supports this construction. In helping to distinguish Mr. Kimura's application from the prior art cited by the examiner, Dr. Hope stated:

> 12. That the teaching of the common general knowledge and prior art as of [the priority date of Mr. Kimura's application] directs the skilled artisan to make a barrier treatment of chemical insecticide around a structure in order to ensure that the said chemical insecticide is unavoidable by termites (i.e., no untreated locations).
>
> . . . .
>
> 14. That, for example, in US Patent 3,624,953 to Crosby, Crosby recites a method wherein a volatile insecticide is placed at discrete locations <u>around</u> a house with the intention that the insecticide may vaporize and thus create a <u>barrier</u> to termite ingress.
>
> 15. That for example, in US patent 5,347,749 to Chitwood et al., Chitwood et al. recite a method of resaturating a dirt layer <u>beneath and around</u> a foundation of a house so as to renew a previously applied <u>barrier</u> treatment against termites.
>
> 16. That, for example, in US patent 5,390,440 to Mihealsick, Mihealsick recites a method of accurately measuring the amount of extermination fluid that would be placed <u>under</u> a concrete slab <u>and/or around</u> a house to optimise the dose; and that this method is understood by a person of ordinary skill in the art as a method of creating or regenerating a <u>barrier</u> to termites.

11

(Crystal Decl. Ex. 9 (Doc. 51-9) ¶¶ 12, 14-16 (emphases added).) Dr. Hope's description of the Crosby prior art demonstrates his understanding that applying insecticide without loopholes only around a building would constitute a barrier treatment. His description of the Chitwood prior art demonstrates his understanding that applying insecticide without loopholes both around and under a building would constitute a barrier treatment. Finally, Dr. Hope's description of the Mihealsick prior art demonstrates his understanding that applying insecticide without loopholes only around a building, only under a building, or both around and under a building would constitute a barrier treatment. Thus, the intrinsic record shows that when Mr. Kimura disclaimed barrier treatments, (Compl. Ex. B (Doc. 1-3) at 3, col. 1, ll. 43-44 ("Another object of the instant invention is to provide a termite treatment without barrier.")), he disclaimed applying insecticide without loopholes around a building, under a building, and both around and under a building.

Plaintiffs have presented a good deal of extrinsic evidence in support of the proposition that a person of ordinary skill in the relevant art at the time of Mr. Kimura's invention would have understood "barrier" to mean only an insecticide application without loopholes both around and under a building. (See Joint Pre-Hr'g Statement (Doc. 133) at 4-6.) Even assuming, arguendo, that such was the state of the art at the time of Mr. Kimura's

12

invention, this court may not use extrinsic evidence to vary or contradict the intrinsic record.  See Markman, 52 F.3d at 981. The intrinsic evidence demonstrates clearly how Mr. Kimura understood barrier treatments and, therefore, what Mr. Kimura disclaimed when he disavowed such treatments.  Cf. CCS Fitness, Inc., 288 F.3d at 1366-67 (stating that claim terms will not be given their ordinary meaning if the patentee acted as his own lexicographer in the intrinsic record or if the intrinsic evidence shows that the patentee expressly disclaimed subject matter).

For purposes of deciding Plaintiffs' Motion for a Preliminary Injunction, this court finds that the Kimura patents, generally, and the specific claim term "Process for the protection of a [future] building against damage caused by insects" cover a process for the protection of a [future] building against damage caused by insects that (a) teaches the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide and (b) teaches away from applying insecticide without loopholes around a [future] building, under a [future] building, and both around a [future] building and under a [future] building.

With this preliminary construction and finding as to the disclaimers, this court proceeds to consider whether the asserted

claims of the Kimura patents read on the accused EP/LI method. This court's review of the Taurus SC label's EP/LI section has revealed no instructions to deliberately create untreated locations (i.e., loopholes) through which the crawling insect can reach the building without being exposed to the insecticide. The "Localized Interior Treatment" portion of the EP/LI instructions directs:

> As part of a complete treatment, targeted interior applications may be made to vulnerable areas such as around plumbing or utility services penetrating floors, bath and/or shower traps, or along concrete expansion joints or settlement cracks.
> If know [sic] termite activity exists in areas inside living spaces or in non-living spaces (such as crawl spaces, plenums etc.) of the structure, a localized interior treatment must be made at the immediate vicinity of the termite activity and radiating out at least 2 feet from the site in two or more directions.

(Defs.' Resp. Opp'n Pls.' Renewed Mot. Prelim. Inj. Ex. 4 (Doc. 123-4) at 12.) While this language implies that a "barrier" treatment is unnecessary on the structure's interior, it focuses on the treated locations rather than the untreated locations and does not affirmatively indicate that "loopholes" in the treatment are desirable.[7] In contrast, the asserted claims of the Kimura

---

[7] This court also notes that the "Exterior Perimeter Treatment" portion of the EP/LI instructions twice directs the user that "[f]or driveways, exterior drilling is necessary only around building supports or wall elements permanently located at driveway joints." (Defs.' Resp. Opp'n Pls.' Renewed Mot. Prelim. Inj. Ex. 4 (Doc. 123-4) at 10-11.) Although this language indicates that a treatment gap corresponding with the location of a driveway is acceptable, (Rotramel Decl. (Doc. 123-1) ¶ 33), this court finds that it does not indicate that such gaps are

14

patents specifically teach the purposeful formation of "untreated locations." (See Compl. Ex. B (Doc. 1-3) at 5, col. 5, l. 58; id. at 6, col. 7, l. 52; Compl. Ex. C (Doc. 1-4) at 5, col. 5, l. 62.)[8]

Further, this court's review of the Taurus SC label's EP/LI method has revealed no instructions to avoid applying insecticide without loopholes around a [future] building, under a [future] building, and both around a [future] building and under a [future] building. To the contrary, the EP/LI instructions state: "This treatment method is designed to be non-invasive to the interior of the structure with the establishment of a <u>continuous treated zone</u> along the exterior of the foundation and only treating interior spaces where termite activity has been found." (Defs.' Resp. Opp'n Pls.' Renewed Mot. Prelim. Inj. Ex. 4 (Doc. 123-4) at 10 (emphasis added).) The "Exterior Perimeter

---

desirable. Notably, this finding is supported by the declaration of Defendants' expert. (Id.)

[8] Dependent claims 2, 6, 8, 9, 10, and 18 of the '010 patent incorporate by reference all the limitations of claim 1 of the '010 patent. See 35 U.S.C. § 112 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."). Dependent claims 21 and 23 of the '010 patent incorporate by reference all the limitations of claim 19 of the '010 patent. See id. Dependent claims 2, 5, 6, 7, and 14 of the '743 patent incorporate by reference all the limitations of claim 1 of the '743 patent. See id. Thus, the teaching of claims 1 and 19 of the '010 patent and claim 1 of the '743 patent to purposefully form "untreated locations" is incorporated in all the asserted claims of the Kimura patents.

Treatment" portion of the EP/LI instructions states further: "To prevent termite infestation of a structure, exterior perimeter applications of Taurus SC <u>must</u> be made in a manner which will create a <u>continuous treated zone</u>." (Id. (emphases added).) Moreover, the EP/LI instructions go on to repeatedly call for the establishment of a "continuous treated zone" along the exterior of the structure, or a "complete exterior perimeter treatment zone." (<u>Id.</u> at 10-12.)[9] Based on their repeated directions to create a "continuous treated zone" along the exterior of the structure, this court finds that the EP/LI instructions call for an application of insecticide without loopholes around a building.

Although this finding is based on this court's own independent reading of the EP/LI instructions, it is noteworthy that the declaration of Defendants' expert supports this court's interpretation. George Rotramel, Ph.D. ("Dr. Rotramel") states

---

[9] With respect to future buildings, the "Pre-Construction Treatment" portion of the Taurus SC instructions states, in pertinent part: "For an exterior perimeter pre-construction treatment, Taurus SC <u>must</u> be applied in such a way as to create a <u>continuous treated zone</u> along the exterior foundation of the structure." (Defs.' Resp. Opp'n Pls.' Renewed Mot. Prelim. Inj. Ex. 4 (Doc. 123-4) at 6 (emphases added).) That portion of the instructions goes on to direct: "Refer to the [EP/LI] section of this label for instructions on applications to the exterior perimeter of a structure and to critical areas in the interior of the structure." (<u>Id.</u>) Thus, with regard to future buildings, the Taurus SC instructions incorporate the EP/LI section's requirements of a "continuous treated zone" along the exterior of the structure, or a "complete exterior perimeter treatment zone." (<u>Id.</u> at 10-12.)

in his declaration that "the Taurus label instructs the [pest control operator] to create, to the extent possible, a continuous, unbroken line of insecticide around the outside of the structure being treated." (Doc. 123-1 ¶ 31.) He goes on to state: "The Taurus label thus instructs the user to create a <u>complete</u> exterior perimeter and <u>not</u> to <u>deliberately</u> form untreated locations along the exterior boundary of the building through which crawling insects can reach the building without being exposed to an effective amount of insecticide." (<u>Id.</u> ¶ 32.) This court agrees with Dr. Rotramel that the EP/LI instructions call for an application of insecticide without loopholes around a building and, therefore, do not direct the user to deliberately create untreated locations along the exterior of the building through which the crawling insect can reach the building without being exposed to the insecticide. As discussed above, this court further finds that the EP/LI instructions likewise do not direct the user to deliberately create such untreated locations along the interior of the building.

For the foregoing reasons, this court finds, for purposes of deciding Plaintiffs' Motion for a Preliminary Injunction, that the asserted claims of the Kimura patents, which (a) teach the deliberate creation of untreated locations (i.e., loopholes) through which the crawling insect can reach the building without

being exposed to the insecticide and (b) teach away from applying insecticide without loopholes around a [future] building, under a [future] building, and both around a [future] building and under a [future] building, do not read on the accused EP/LI method. Thus, this court concludes that Plaintiffs have failed to carry their burden of making a clear showing that they will likely prove that Defendants infringe at least one valid and enforceable patent claim.  See Winter, 129 S. Ct. at 375-76; Abbott Labs., 473 F.3d at 1201.

In view of this conclusion, and because a plaintiff must satisfy all four prongs of the pertinent test in order to obtain a preliminary injunction, see Real Truth About Obama, Inc., 575 F.3d at 346, it is unnecessary for this court to consider irreparable harm, the balance of equities, and whether an injunction would be in the public interest.  As Plaintiffs have failed to demonstrate that they are likely to succeed on the merits, their Motion for a Preliminary Injunction must be denied. See id.

**IV. CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (see Docs. 8, 73, 89) is **DENIED.  IT IS FURTHER ORDERED** that the temporary restraining order previously entered in this case (Doc. 127) is **DISSOLVED.**

18

This the 27th day of May 2011.

                                         /s/ William L. Osteen, Jr.
                                         United States District Judge