IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BASF AGRO B.V., ARNHEM (NL),           )
WADENSWIL BRANCH, and                  )
BAYER S.A.S.,                          )
                                       )
            Plaintiffs,                )
                                       )          1:10CV276
     v.                                )          1:14MC8
                                       )
MAKHTESHIM AGAN OF NORTH               )          **FILED UNDER SEAL**
AMERICA, INC. (MANA) and               )
CONTROL SOLUTIONS, INC.,               )
                                       )
            Defendants.                )
                                       )
*****************************************************************
BASF AGRO B.V., ARNHEM (NL)            )
ZURICH BRANCH,                         )
                                       )
            Plaintiff,                 )
                                       )
     v.                                )          1:13CV422
                                       )
MAKHTESHIM AGAN OF NORTH               )          **FILED UNDER SEAL**
AMERICA, INC. (MANA),                  )
CONTROL SOLUTIONS, INC.,               )
and DO IT YOURSELF PEST               )
CONTROL, INC.                          )
                                       )
            Defendants.                )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

     Presently before this court is an Amended Motion for

Contempt filed by BASF Agro B.V., Arnhem (NL), Wadenswil Branch,

and Bayer S.A.S. (collectively, "BASF"). (1:14MC8 (Doc. 487);

1:10CV276 (Doc. 425); 1:13CV422 (Doc. 86).)[1] The full procedural and factual history of this case is set out in a prior order and is incorporated by reference herein. (See generally Doc. 447.)

In summary, following an evidentiary hearing, this court previously found that Defendant Control Solutions, Inc. ("CSI") "imported two lots of Taurus, Lot Nos. 23569 and 23795, and that those lots 'contained fipronil technical material which was not made by the Currently Intended Process, and were sold in the United States in violation of the Consent Judgment.'" (Id. at 23 (quoting 1:10CV276 (Doc. 311) at 1).)[2] As further found, "[t]his court has the authority to hold parties in civil contempt for violating an order of the court as a means of coercing the contemnor into complying with a court's order in the future or as a means of compensating the complainant for losses resulting from the noncompliance." (Id. at 25 (citing Colonial Williamsburg Found. v. Kittinger Co., 792 F. Supp. 1397, 1407 (E.D. Va. 1992), aff'd, 38 F.3d 133 (4th Cir. 1994)).)

---

[1] The docket 1:14MC8 was created for the civil contempt proceedings between these parties that resulted from case number 1:10CV276. Unless otherwise noted, all citations will refer to the 1:14MC8 docket.

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

Defendants CSI and Makhteshim Agan of North America, Inc. (Mana) ("MANA")[3] were held in contempt for violating the Consent Judgment, and the matter was continued for discovery and further hearing on an appropriate remedy.

Following discovery and briefing on damages and a remedy, on April 23, 2018, this court held a hearing on a remedy. BASF presented evidence including exhibits and the testimony of Christopher A. Vellturo, Ph.D. Defendants presented evidence including exhibits and the testimony of Mark Boyd, President of CSI, and Gregory K. Bell, Ph.D.

This matter is now ripe for decision, and for the reasons stated herein, this court will grant BASF's motion.

## I. <u>FACTS</u>

This court finds the following facts based on the testimony and exhibits admitted at the April 23, 2018 hearing: CSI began selling its fipronil product, Taurus© SC ("Taurus"), in June 2011 as a generic competitor to BASF's fipronil product. In November 2011, Mr. Boyd placed an order with Irvita[4] for 50,000 liters (approximately 13,000 pounds) of formulated Taurus, to be

---

[3] MANA is a subsidiary of Makhteshim Again Industries Ltd. ("MAI"). MANA owns two thirds of CSI; Mr. Boyd owns the rest. MAI has since been acquired by another company.

[4] Irvita is also a subsidiary of MAI.

- 3 -

delivered in March 2012 in anticipation of sales and deliveries in the fourth quarter of 2012 and early 2013. Irvita was to schedule the formulation of the product with MCW.[5] In February 2012, Mr. Boyd learned that, for reasons not relevant here, neither MCW nor Irvita were either interested in or capable of filling that order.

Instead, MAI contracted the fipronil formulation to Proficol, another MAI subsidiary located in Columbia, South America. The records presented to this court suggest, but do not dispositively show, that MCW forwarded to Proficol fipronil technical product for use in formulating the order. The fipronil technical provided by MANA was purportedly conforming, that is, it had been manufactured by the process permitted under the terms of the Consent Judgment. The evidence presented both in the form of e-mails, (see, e.g., Defs.' Ex. 14) as well as the testimony of Mr. Boyd suggests that the fipronil technical as well as instructions for the formulation process were sent to "Ernesto," the plant manager at Proficol in Columbia, South America. In spite of the purported instructions, Proficol formulated the fipronil product for CSI's order using non-comforming fipronil technical, that is, fipronil which was

---

[5] MCW is also subsidiary of MAI.

- 4 -

formulated and manufactured through a process not permitted under the terms of the Consent Judgment.

This court finds that nonconforming fipronil was then used to fill CSI's order and ultimately sold in the United States by CSI, all in violation of the Consent Judgment. CSI received the first shipment of nonconforming formulated Taurus from Proficol on July 16, 2012 and began selling "after August 7, 2012." (See 1:10CV276 Defs.' Notification (Doc. 311) at 1.)[6] CSI received the second shipment of nonconforming formulated Taurus on August 9, 2012, and began selling it in February 2013. (Id.)

This court credits Mr. Boyd's testimony at the April 23, 2018 hearing and finds that Mr. Boyd was not aware the fipronil was manufactured through a process which was prohibited under the terms of the Consent Judgment until after CSI's receipt and sale in the United States. As Mr. Boyd testified, CSI became aware in April 2013 that nonconforming fipronil had been used.

## II.  <u>LEGAL STANDARD</u>

Courts "may impose sanctions for civil contempt 'to coerce obedience to a court order or to compensate the complainant for

---

[6] In February or March 2012, as CSI was determining how to get the product, it placed another order for another 50,000 liters with Irvita. That order was cancelled in the first week of August 2012 after receipt of the first shipment from Proficol.

losses sustained as a result of the contumacy.'" <u>In re Gen.</u>

<u>Motors Corp.</u>, 61 F.3d 256, 258 (4th Cir. 1995) (citation

omitted).

> The appropriate remedy for civil contempt is within
> the court's broad discretion. <u>McComb</u>, 336 U.S. at 193-
> 94, 69 S. Ct. at 500-501. Remedies include ordering
> the contemnor to reimburse the complainant for losses
> sustained and for reasonable attorney's fees. <u>United</u>
> <u>States v. Trudell</u>, 563 F.2d 889, 891 (8th Cir. 1977).
> However, the remedies and sanctions must be remedial
> and compensatory and, unlike criminal contempt,
> nonpunitive. <u>United Mine Workers</u>, 330 U.S. at 302-04,
> 67 S. Ct. at 700-701. "Generally, a compensatory
> sanction 'may not exceed the actual loss to the
> complainant caused by the actions of respondent, lest
> the contempt fine become punitive in nature, which is
> not appropriate in a civil contempt proceeding.'" <u>In</u>
> <u>re Tetracycline Cases</u>, 927 F.2d 411, 413 (8th Cir.
> 1991) (quoting <u>NLRB v. Laborers' Int'l Union</u>, 882 F.2d
> 949, 955 (5th Cir. 1989)).

<u>Id.</u> at 259. "Generally, regional circuit law governs the

sanctions award in civil contempt proceedings." 2 Patent Law,

Legal and Economic Principles § 9:11 (2d ed.) (citing <u>Graves v.</u>

<u>Kemsco Grp., Inc.</u>, 864 F.2d 754, 755 (Fed. Cir. 1988). "However,

in the patent context, sanctions are usually determined under

the standards for awarding damages in patent infringement

cases." <u>Id.</u> (citing <u>Stryker Corp. v. Davol Inc.</u>, 234 F.3d 1252,

1260 (Fed. Cir. 2000); <u>Spindelfabrik Suessen-Schurr v. Schubert</u>

<u>& Salzer Maschinenfabrik Aktiengesellschaft</u>, 903 F.2d 1568, 1578

(Fed. Cir. 1990)).

- 6 -

III. **ANALYSIS**

Relying on Dr. Velluro's expert report, BASF asks for "$7.7 million in lost profits from lost sales and price erosion as a result of the contempt of Defendants." (Pls.' Mem. in Supp. of its Am. Second Contempt Mot. ("Pls.' Br.") (Doc. 488) at 9.) BASF also asks for attorneys' fees and costs because of Defendants' alleged "wholesale lack of institutional control, dismal effort to ameliorate their wrongdoing, and conscious decision to withhold information about the violation for months[.]" (Id. at 17.) Defendants, on the other hand, contend that "BASF suffered no lost sales or price erosion damages" and ask this court to award Plaintiffs nothing. (Defs.' Opp. to BASF's Am. Second Contempt Mot. ("Defs.' Resp.") (Doc. 495) at 5.)

A.    **Lost Profits from Lost Sales**

Remedies in civil contempt cases may include "losses sustained and . . . reasonable attorney's fees." In re Gen. Motors Corp., 61 F.3d at 259 (citation omitted). "The assessment of lost profits [is] an available sanction for contempt." See Seiko Epson Corp. v. Nu-Kote Int'l, Inc., 190 F.3d 1360, 1372 (Fed. Cir. 1999). A patentee must establish with reasonable probability that "but for" the infringing sales, it would have made the infringer's sales. Ericsson, Inc. v. Harris Corp., 352

- 7 -

F.3d 1369, 1377 (Fed. Cir. 2003). "To show 'but for' causation, the patentee must reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product." Id. (citation omitted). "A patentee may resort to any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement." Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1122 (Fed. Cir. 2003).

"The Panduit and two-supplier market tests are recognized methods of showing 'but for' causation." Id. "The Panduit test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made." Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1545 (Fed. Cir. 1995) (citing Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978)). However, in a two-supplier market, "it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales." Micro Chem., 318 F.3d at 1122 (citation omitted); see also Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983) ("Where, as here, the patent owner and the infringer were the only suppliers of the

- 8 -

product, causation may be inferred."). Thus, "the two-supplier market test collapses the first two Panduit factors into one[.]" Micro Chem., 318 F.3d at 1124. Under this theory, "a patentee must show: 1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales." Id. (citations omitted). The relevant market will include "substitutes similar in physical and functional characteristics to the patented invention" but "excludes alternatives . . . with disparately different prices or significantly different characteristics." Id. (citations omitted).

BASF asserts entitlement to lost profits under the two-supplier market theory. With respect to the first factor, this court finds that BASF and CSI were the only two U.S. market sources of fipronil, a termiticide in significant demand in the termite control market, and sellers of a fipronil product in the United States. While there are a number of other termiticide treatment products available, market analysis appears to show a clear preference, by sales figures, for fipronil products. (See,

- 9 -

e.g., Pls.' Ex. L, Doc. 490-12 ¶ 31; Defs.' Ex. 3 at 1.)[7] Other principal non-fipronil termiticide products, such as Premise and Talstar, are priced substantially differently than Termidor, supporting Dr. Vellturo's opinion that these products are not close substitutes to Termidor. (See Pls.' Ex. L, Doc. 490-12 ¶ 16 & Ex. 4.) As a result, this court finds it reasonable to infer that in the absence of fipronil product from CSI, purchasers would have purchased that product from BASF.

With respect to the second factor, BASF's own manufacturing and marketing capability to make the sales that were diverted to the infringer, Defendants do not appear to dispute that BASF had the capability but instead challenge the basis of Dr. Vellturo's

---

[7] Dr. Vellturo's report indicated his understanding to be that "other types of termiticide products are not considered substitutable for fipronil-based products, as they are less efficacious and have a much shorter period of efficacy." (Pls.' Ex. L, Doc. 490-12 ¶ 9.) At the April 23, 2018 hearing, Dr. Vellturo agreed that there was nothing stopping someone in the business of applying termiticides from theoretically choosing a non-fipronil based termiticide, but contended they would be distant substitutes. Defendants introduced evidence of a BASF "2012 PCF End User Rebate" referring to non-Fipronil products as competitors. (See Defs.' Ex. 6.) It is unclear the extent to which this program was implemented. Defendants also introduced a document showing BASF referring to non-fipronil Sentricon as showing a challenge in a hypothetical market scenario and to another company potentially "creating interest with greener [non-fipronil] termite technology." (See Defs.' Ex. 5.) That BASF was aware of non-fipronil-based termiticides does not undermine this court's conclusion that Termidor and Taurus were the only two acceptable substitutes in the market during the relevant timeframe.

opinion as to this capacity. (Defs.' Resp. (Doc. 495) at 19.) At the April 23, 2018 hearing, Dr. Bell testified that he did not form an opinion on whether BASF had this capacity. This court finds that BASF had the capacity to supply all of the market demand met by the contempt lots. (See Pls.' Ex. L, Doc. 490-12 ¶¶ 53-55.)

With respect to the third factor, BASF's expert calculated the amount of profit it would have made from the diverted sales. Of the 50,000 liters of nonconforming Taurus in the two contempt lots, approximately 45% was recalled, and Dr. Vellturo's analysis excluded lost profits on this 45%. For the 55% of nonconforming Taurus that was not recalled, Dr. Vellturo applied the average 2011 selling price of Termidor, using the same distribution by product as the distribution of the nonconforming product that was recalled. (Id. ¶¶ 58-60.) Dr. Vellturo used the 2011 price because "BASF only reduced the price of Termidor in anticipation of the launch of Taurus because it was not aware that Taurus would be an unreliable source of fipronil for its customers[.]" (Id. ¶ 60.) Therefore, Dr. Vellturo posited that BASF would have been able to raise its 2012 pricing to what it was in 2011. For the reasons explained as to why this court finds BASF's price erosion theory unpersuasive, infra, this court is also unpersuaded that the average 2011 selling price of

- 11 -

Termidor is the appropriate price to use to calculate lost profits on the nonconforming Taurus that was sold in 2012 and 2013. Dr. Vellturo calculated total sales of $1,812,612, and after subtracting manufacturing and other incremental costs based on 2012 to 2013 data, Dr. Vellturo reached a figure of $1,072,083. (Id. at 56, Ex. 10.)

Dr. Vellturo's report indicates that at the time of his calculations he did "not have the specific dates of each sale of the Taurus products in the non-conforming lots[.]" (Id. ¶ 58.) Sales of Taurus from the contempt lots started in 2012 and ended in 2013, and Mr. Boyd testified that all 50,000 liters had been shipped by the time Defendants notified the court in April 2013 of the contempt and began the recall process, which ultimately recalled 45% of the nonconforming Taurus. This court has considered each of the average yearly pricing figures provided by BASF and finds it reasonable to calculate the lost profits based on the 2013 selling price as provided in Dr. Vellturo's report, (see id. at 48, Ex. 5), and finds the total sales to be $1,587,258.59, and $847,518.59 after subtracting incremental costs.

Dr. Vellturo then applied an "expansion adjustment" "that a lower priced generic product generates that would not have been purchased at the higher price of the incumbent." (Id. at 26, 60,

- 12 -

Ex. 13.) Dr. Vellturo estimated, and Dr. Bell's testimony did not dispute, that this expansion adjustment would be small due to the relative inelasticity of the market for fipronil products. This court finds that an expansion adjustment of $60,316.36 is appropriate given the 2013 Termidor average selling price, resulting in a total of $787,202.23. This court concludes that BASF has shown with reasonable probability that it lost sales resulting in lost profits in the amount of $787,202.23.[8]

Thus, BASF has established all of the factors under the two-supplier market test. This "showing erects a presumption of 'but for' causation[,]" which the infringer may rebut "by showing that the patentee reasonably would not have made some or all of the diverted sales 'but for' the infringement." Micro Chem., 318 F.3d at 1125. "For example, the infringer may rebut the presumption by showing that it sold another available, noninfringing substitute in the relevant market. This situation would arise only where there are two suppliers in the market,

---

[8] While this court is not ordering Defendants to disgorge their profits on the nonconforming Taurus, this figure approaches the figure given by Defendant's counsel that CSI's profits on the $1.8 million in sales for the nonconforming, unrecalled Taurus, totaled approximately $1 million.

- 13 -

but the infringing supplier had two available alternatives: one infringing and the other noninfringing." Id.

Defendants argue that they could have supplied CSI's "customers without using any non-conforming material[,]" and that the "availability of this non-infringing alternative defeats BASF's lost profits claim." (Defs.' Resp. (Doc. 495) at 12 (citing Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1351 (Fed. Cir. 1999); Rite-Hite Corp., 56 F.3d at 1545 ("The Panduit test requires that a patentee establish . . . absence of acceptable non-infringing substitutes . . ."))). BASF argues that Dr. Bell's report is based on "records that (a) were not timely produced to BASF, (b) were misconstrued by Dr. Bell, (c) are suspect on their face, and (d) do not, in any event, support Dr. Bell's contentions." (Pls.' Br. (Doc. 488) at 10.) After careful review of the record, this court concludes Defendants have not rebutted the presumption that BASF has erected with regard to but-for causation.[9]

Defendants argue that they could have supplied their customers with conforming Taurus, and therefore, acceptable non-

---

[9] Alternatively, this court also finds that BASF has met each element under the Panduit test.

infringing substitutes existed.[10] Dr. Vellturo admitted that if CSI knew and believed it could supply its customers with conforming Taurus in advance of the customers' need for that Taurus, than customers would never have a need to turn to BASF. However, for several reasons, CSI has failed to show this scenario and rebut BASF's presumption of causation.

Defendants present contradictory evidence. For example, Mr. Boyd, in testimony and in a declaration, stated that "[h]ad CSI learned in late July or early August 2012 that it had imported non-compliant Taurus® SC, CSI had the time, materials, manufacturing capability, and manufacturing capacity to formulate replacement, compliant Taurus® SC here in the United States to meet demand for that product." (See Defs.' Ex. 2 ¶ 11.) However, in May 2012, Mr. Boyd e-mailed Makhteshim, stating "I need 13,000 gallons in September late. Without this product our [professional pest control] business will take a

---

[10] BASF disputes that Grain Processing's "non-infringing alternative" analysis should apply to the framework of determining damages for civil contempt. (Pls.' Br. (Doc. 488) at 19-22.) While this court notes that "in the patent context, sanctions are usually determined under the standards for awarding damages in patent infringement cases[,]" 2 Patent Law, Legal and Economic Principles § 9:11 (2d ed. 2015) (citations omitted), this court need not definitely determine the applicability of Grain Processing as Defendants have failed to show that CSI had the capability or capacity to obtain or formulate sufficient conforming Taurus during the relevant timeframe.

major hit . . . ." (Defs.' Ex. 23.) Mr. Boyd testified that, although the e-mail stated the Taurus was needed in September, that it really was not needed until December to get it into the hands of the distributors in January and February.

Mr. Boyd also declared that, since July 2012, CSI had the capacity to formulate 4,000 gallons or 15,000 liters of Taurus per day, and that it would have taken CSI between six and fourteen days to formulate 50,000 liters of conforming Taurus. (Defs.' Ex. 2 ¶ 12.) He declared that as of June 30, 2012, CSI had over 50,000 liters of Taurus in inventory that "could have been packaged and ready for delivery." (Id. ¶ 14.) At the April 23, 2018 hearing, however, Mr. Boyd corrected this statement and said that the inventory did not differentiate between conforming and nonconforming material. Therefore, the 50,000 liters did not refer to conforming Taurus that could have been packaged and ready for delivery.

Additionally, Mr. Boyd's testimony about the timing of CSI's capabilities contrasts with previous sworn CSI interrogatory responses stating that CSI did not have the capability to formulate Taurus "up and running" until the end of 2012, notwithstanding the fact that CSI successfully formulated a test batch in the U.S.-based facility in July 2012. (See Defs.' Objs. & Resps. to Pl.'s Interrogs. Relating to Pl.'s

- 16 -

Second Contempt Mot. (Doc. 490-2) at 12.)[11] CSI did not run a

production formulation of Taurus until March 2013, after all of

the nonconforming Taurus had already been shipped. While

Defendants argue that that CSI had ability to do so in July 2012

and could have met the demand in a but-for world, (Defs.' Resp

(Doc. 495) at 13), this court is not persuaded that merely

because CSI could successfully formulate a commercial test batch

in July 2012, that CSI had the ability to formulate the product

in commercial quantities during that timeframe, especially given

Mr. Boyd's contradictory statements. Dr. Bell's opinion, which

was based on this pilot, that CSI would have been able to

formulate Taurus at its U.S. facility is thus not persuasive, in

light of the limited nature of the initial pilot and absence of

corroborating facts.

This court is also not confident as to the credibility of

Dr. Bell's projections of available fipronil technical at MCW,

an MAI affiliate, and the ability of Defendants to provide CSI

with that fipronil technical. Similar to how Dr. Bell had formed

his opinion as to the 50,000 liters of CSI on-hand conforming

Taurus, which was later found to be nonconforming Taurus,

---

[11] Plaintiffs did not label this exhibit with an exhibit
number but it was admitted as part of the parties' joint
stipulation.

Dr. Bell testified at the April 23, 2018 hearing that he formed his opinion as to MCW's available on-hand inventory through documents received from MCW, (see, e.g., Defs.' Ex. 29), and interpretations of those documents by representations of individuals at MCW.

Notwithstanding the errors in the report, Dr. Bell opined that CSI could have formulated adequate Taurus to meet every single sale on the date each sale was made based on these documents and representations from MCW. However, MAI apparently had other customers, products, and markets, and CSI was not in control of the inventory of MCW's fipronil technical. No persuasive evidence has been presented to support the availability of this fipronil technical for CSI's use.

These interpretations also appear to have been subject to additional misunderstandings or misrepresentations. For example, Dr. Bell testified that he was previously unaware that high grade fipronil, which had been included in the analysis of available conforming fipronil, was generally directed toward the pet market, not the termiticide market. Mr. Boyd testified that high grade fipronil could theoretically be made into Taurus, but also stated that it was sold into the pet market under a different brand.

- 18 -

For all of these reasons, after reviewing all of the
evidence, this court does not assign significant weight to the
representations as to fipronil technical available to
Defendants.

**B.** **Lost Profits from Price Erosion**

Under a price erosion theory, the patentee is required to
"show that 'but for' infringement, it would have sold its
product at a higher price[;]" "present evidence of the
(presumably reduced) amount of product the patentee would have
sold at the higher price[;]" and "account for the nature, or
definition, of the market, similarities between any benchmark
market and the market in which price erosion is alleged, and the
effect of the hypothetically increased price on the likely
number of sales at that price in the market." Ericsson, 352 F.3d
at 1378 (citations omitted). The patentee must show substantial
evidence that the infringer eroded the market price. See
Wechsler v. Macke Int'l Trade, Inc., 486 F.3d 1286, 1294 (Fed.
Cir. 2007).

In his analysis, Dr. Vellturo calculated the difference
between the "average annual per-unit sale price of each Termidor
product in 2011" and the "average annual per-unit sale price of
Termidor in 2013[.]" (Pls.' Ex. L, Doc. 490-12 ¶ 64.) In other
words, Dr. Vellturo opined that, but-for the contempt, BASF

- 19 -

would have raised the price of Termidor back to the price from before the entry of generic fipronil, where it would have remained through 2013. Dr. Vellturo then applied an expansion adjustment.

This court does not find Dr. Vellturo's price erosion theory to be supported by substantial evidence. BASF has previously presented testimony and evidence in this court that once a price dropped in response to a generic product it could not be raised again. (See 1:10CV276 Tr. of Hearing May 4, 2011, (Doc. 149) at 181; Ex. A, Decl. of Keith A. Holmes (Doc. 10-2) ¶ 50).) While the average pricing of Termidor, as shown in Dr. Vellturo's report, did increase somewhat from 2012 to 2013, (Pls.' Ex. L, Doc. 490-12 at 48, Ex. 5), the information provided to Dr. Vellturo by BASF and relied on in his opinion, that prices could rise in response to certain market conditions, is inconsistent with BASF's prior testimony, and Dr. Vellturo was not aware of that testimony. As a result, Dr. Vellturo did not offer a compelling explanation for the inconsistency. CSI entered the market in 2011 with a generic fipronil product, which was the initial cause of BASF's price drop. BASF has not adequately demonstrated that it could thereafter raise its prices, in light of the prior BASF testimony.

Furthermore, Dr. Vellturo's price erosion theory is founded upon at least one assumption that this court does not find persuasive, that is, "had BASF known Defendants would face supply interruptions and not be in a position to provide a reliable and consistent source of fipronil, . . . BASF would have been the sole source of fipronil-based termiticide to meet demand in the marketplace and the price of Termidor would reflect these marketplace dynamics." (Id. ¶ 62.) Given the evidence presented, it is not clear that BASF would have ever known that Defendants would face supply interruptions prior to the time any interruptions occurred. Instead, BASF would have learned of supply interruptions during or after any interruption, rather than before. Alternatively, had Dr. Vellturo assumed a price erosion theory based upon BASF's discovery of supply interruption during or after the actual interruption (by way of CSI's recall), as appears to have in fact occurred, then Dr. Vellturo's theory would be undermined by the fact no evidence was presented to suggest the price erosion theory was consistent with post-interruption experience.

Therefore, because Dr. Vellturo was unable to explain how BASF could have raised its price back to the price that BASF commanded prior to the entry of Taurus into the marketplace, and because there is no evidence to suggest that BASF would have

known of supply interruptions before those interruptions occurred, this court rejects Dr. Vellturo's price erosion theory and assigns no weight or damage calculation under this theory.

### C.  Attorneys' Fees

Under the American Rule, a prevailing litigant is typically not entitled to attorneys' fees, but an exception exists where there has been "willful disobedience of a court order." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 258 (1975) (citations omitted). "In the context of contempt, district courts in the Fourth Circuit have held that 'the contemnor's refusal to comply with a court's order must rise at least to the level of obstinance or recalcitrance before the willful exception is invoked.'" JTH Tax, Inc. v. Noor, Action No. 2:11CV22, 2012 WL 4473252, at *5 (E.D. Va. Sept. 26, 2012) (quoting Omega World Travel, Inc. v. Omega Travel, Inc., 710 F. Supp. 169, 173 (E.D. Va. 1989), aff'd, 905 F.2d 1530 (4th Cir. 1990) (per curiam) (table)); see also id. (collecting cases).

Defendants have stated and argued repeatedly that the violation of the Consent Judgment was the result of negligence or mistake and that the mistake was one by Proficol in that Proficol had conforming fipronil technical material and for some reason failed to use that in its formulation.

- 22 -

The manufacture of fipronil is a process arguably subject
to the constraints of a patent owned by BASF. BASF's patent
rights were the original subject of the litigation with MANA
which in turn led to the Consent Judgment. In spite of the
arguable application of a patent prohibiting the manufacture and
sale of the subject fipronil in the United States and a Consent
Judgment which clearly prohibited the manufacture and sale of
the subject fipronil, MANA took virtually no steps to insure the
appropriate formulation process by Proficol to secure compliance
with the terms of the Consent Judgment. MANA presents no history
of its relationship with Proficol or the reliability of Proficol
as a manufacturer. While MANA has submitted an e-mail
instruction that was sent to an alleged plant manager identified
only as "Ernesto Cuellar," (Defs.' Ex. 14), no evidence has been
presented to suggest "Ernesto's" expertise or reliability other
than his position as a plant manager. In spite of all these
uncertain conditions, MANA took no reasonable steps to assure
formulation in accordance with the requirements of the Consent
Judgment, did not take steps to supervise the formulation of the
subject fipronil, nor did MANA test the final product or
otherwise confirm its proper formulation prior to delivery in
the United States.

- 23 -

For all of these reasons, this court finds Defendants'
violation of the Consent Judgment to be the result of obstinance
and recalcitrance. Additionally, this court considers that
MANA's actions amounted to willful blindness[12] of the fact that
the subject fipronil was formulated through a prohibited
process. Although this court finds that CSI was not aware of
process used to formulate the subject fipronil, this court also
finds that MANA's violation of the Consent Judgment was
intentional. Courts have found that willful blindness is
sufficient indicia of willful conduct, further supporting the
finding that Defendants acted obstinately and recalcitrantly.
See, e.g., Island Software & Computer Serv., Inc. v. Microsoft
Corp., 413 F.3d 257, 263-64 (2d Cir. 2005) (holding that willful
blindness to a copyright holder's rights is sufficient to prove
willful infringement); Schaefer Fan Co. v. J & D Mfg., 265 F.3d
1282, 1290 (Fed. Cir. 2001) (upholding district court's finding
that defendant acted willfully in failing to obtain opinion of

---

[12] Willful blindness is a concept most often arising in
criminal cases and one that "allows the jury to impute the
element of knowledge to the defendant if the evidence indicates
that he purposefully closed his eyes to avoid knowing what was
taking place around him." United States v. Schnabel, 939 F.2d
197, 203 (4th Cir. 1991). When MANA sought to fill CSI's order
using Proficol, it does not appear to this court any reasonable
steps were taken that would have allowed MANA to know the
fipronil product would be formulated through a compliant
process, or ultimately how it would be formulated at all.

- 24 -

counsel on whether a product would breach a settlement agreement and court order). Therefore, this court concludes that an award of attorneys' fees is appropriate in this case.[13]

## IV. <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that BASF's Amended Motion for Contempt, (1:14MC8 (Doc. 487); 1:10CV276 (Doc. 425); 1:13CV422 (Doc. 86)), is **GRANTED** and that BASF is awarded $787,202.23 in lost profits.

**IT IS FURTHER ORDERED** that recalled Taurus held by Defendants, Lot Nos. 23569 and 23795, shall be **DESTROYED.**

**IT IS FURTHER ORDERED** that Defendants pay, jointly and/or severally, reasonable attorneys' fees to BASF related to BASF's motions for contempt, (Doc. 248, 321, 383, 487). The parties

---

[13] Defendants argue that "BASF has never argued or even suggested a basis to pierce the corporate veil" and that the actions of MCW, Irvita, and Procicol "cannot be imputed to Defendants[.]" (<u>See</u> Defs.' Resp. (Doc. 495) at 7, 26-27.) This contempt proceeding concerns the actions of <u>CSI</u> and <u>MANA</u>, the only parties currently before this court as Defendants, and their violation of the Consent Judgment by importing nonconforming Taurus into the United States. Specifically, the Consent Judgement specified the "Currently Intended Process" "for making Fipronil that Defendants or their affiliated companies currently plan (a) to import into or sell, offer for sale, make, or use in the U.S., (b) to incorporate into any products imported into or sold, offered for sale, made, or used in the U.S., or (c) to intentionally supply outside the United States for others knowing that such others intend to incorporate into, any products imported into or sold, offered for sale, made, or used in the U.S." (1:10CV276 Doc. 46 at 1-2.)

shall engage in consultation regarding attorneys' fees within forty-five days of this Order. The parties shall also consult regarding prejudgment interest.[14] If the parties believe a mediator would be appropriate, this court will consider the appointment of a mediator. If the consultation does not resolve this matter, the parties shall file one joint status report stating that a consultation was held and despite the good-faith effort of the parties and counsel, no resolution was reached. The court will then order that the issues of attorneys' fees and prejudgment interest be briefed.

**IT IS FURTHER ORDERED** that this Memorandum Opinion and Order is **FILED UNDER SEAL** and the parties shall file, within ten (10) days of the filing of this Opinion, a joint report identifying the information in the Opinion, if any, they contend should be redacted, along with an explanation of the basis for their proposed redactions and a draft of this Opinion with those proposed redactions. Because information contained herein will likely be considered confidential information by the parties,

---

[14] Although BASF appears to contend it is entitled to prejudgment interest at the North Carolina interest rate, the matter has not been sufficiently briefed to permit a determination. If the parties are not able to resolve the prejudgment interest issue, it will be addressed by subsequent briefing.

- 26 -

this Opinion shall remain sealed until the parties have had an opportunity to submit their requested redactions.

This the 31st day of August, 2018.

_____
United States District Judge